**UNITED STATES of America, Appellee,**

v.

**Thomas DUVALL and Henry Jones, Defendants-Appellants.**

**Nos. 507, 508, Dockets 75–1225, 75–1335.**

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1975.

Decided Feb. 26, 1976.

Certiorari Denied July 21, 1976.

See 96 S.Ct. 3173.

16

Jesse Berman, New York City, for defendant-appellant Thomas Duvall.

Ozro Thaddeus Wells, New York City, for defendant-appellant Henry Jones.

T. Barry Kingham, Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty., S. D. N. Y., and John D. Gordan, III, Asst. U. S. Atty., New York City of counsel), for appellee.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

■ Thomas Duvall and Henry Jones appeal from a judgment of the District Court for the Southern District of New York convicting them, after a verdict, on a count of conspiring to possess stolen mail and to utter United States Treasury checks bearing forged endorsements in violation of 18 U.S.C. § 371 and on substantive counts charging possession of stolen mail and uttering forged Treasury checks in violation of 18 U.S.C. §§ 495 and 1708. The Government's claim was that the defendants, who operated a series of grocery and food-related stores in Harlem, including "The Prodigal Son," "The Nile Market," "Your Bakery," and the "Shabazz Steak and Take," paid suppliers and made bank deposits with stolen United States Treasury checks which

bore forged endorsements, checks they would replace with still other stolen and forged Treasury checks if those initially passed came back. Almost the sole issue at trial was the defendants' guilty knowledge. The Government's evidence was ample to support the convictions, and there is no need to discuss the contentions, advanced by Jones and adopted by Duvall, relating to the merits.

## I.

The serious question, raised and raisable only by Duvall, is that the court erred in failing to suppress false exculpatory statements and minor inculpatory statements made by him. Some of these were made in an interview with Secret Service Agent Gniazdowski in the early evening of the day of Duvall's arrest; others were made in an interview the next morning with an Assistant United States Attorney prior to Duvall's arraignment. Duvall contends that the admission of these statements violated his Sixth Amendment right to counsel, the rule prohibiting use of involuntary statements, his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the *McNabb-Mallory* rule, *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The circumstances under which these statements were made were the subject of a lengthy suppression hearing.

At 2:00 p. m. on June 3, 1974, Agent Gniazdowski, who had been in charge of the investigation, met with an Assistant United States Attorney (who was not the assistant who tried the case or argued the appeal) in the latter's office. They prepared complaints against Duvall, Jones and a co-defendant Porter, who was later acquitted. A stake-out of The Prodigal Son had been in effect since 1:00 p. m. Shortly before 2:45 p. m. the Assistant U. S. Attorney and Gniazdowski went before a magistrate.

Gniazdowski swore to the complaints, these were filed, and the magistrate issued arrest warrants. Gniazdowski then radioed his men in Harlem to arrest the three defendants.

Duvall was promptly arrested as he was driving his car north on Madison Avenue not far from the store, with a passenger in the front seat. Nine agents, in three cars, forced him to stop. All the agents were armed with .357 magnum handguns; two of the agents, Schwarick and Doyle, leveled shotguns at Duvall's head during the arrest. Agent Schwarick ordered Duvall to leave the car. Agent Chodosh pulled the passenger out.[1] Another agent nudged Duvall out of the automobile by punching him in the shoulder. Neither Duvall nor the passenger was armed and the record contains evidence that the agents expected the defendants to be unarmed.

After a pat-down Duvall was placed in the back of a Secret Service car with his hands cuffed behind him. Agent Schwarick sat with him, Agent Chodosh was driving, and another agent was in the front passenger seat. When Duvall asked what was up, Schwarick informed him that he had been arrested on a warrant by Secret Service Agents for passing forged Treasury checks. Schwarick testified, and the court found, that he gave Duvall the *Miranda* warnings. Agent Chodosh claimed that Duvall had made an oral waiver. Duvall denied this and the court made no finding on the subject but the point is immaterial since there was no questioning in the car.

Duvall arrived at the Secret Service office at 90 Church Street—a few blocks from the courthouse—shortly after 4:00 p. m. Gniazdowski testified that the purpose of taking Duvall there was to photograph and fingerprint him. There would have been ample time for doing this before the magistrate left around 6:00 p. m. Instead Agents Schwarick and Chodosh placed Duvall in an interrogation room where he was ordered to

---

1. Duvall testified that Chodosh ripped the man's shirt off. Chodosh conceded that the passenger's clothing might have ripped.

strip and was given a strip search.[2] While Duvall was dressing, Agent Chodosh left the room to obtain a Secret Service form entitled "Warning and Consent to Speak." This contains three parts, a "Warning of Rights," fully conforming to the *Miranda* requirements and containing a sentence "I have read this statement of my rights and it has been read to me, and I understand what my rights are," followed by a line for signature; a detailed "Waiver,"[3] again followed by a line for signature; and a "Certification" form for the agent and two witnesses. Agent Chodosh read the form aloud, gave it to Duvall to read, and asked him to sign it. Duvall did this at about 4:20 p. m. He claimed that the reading of the form and his signature were preceded by Chodosh's telling him he "would never see the light of day" unless he cooperated. Chodosh, who had testified before Duvall, had not been asked about this, the Government did not recall him at the suppression hearing, and the court made no specific finding on the subject.

Agent Gniazdowski made his first appearance in the interrogation room at this juncture. He orally advised Duvall of his rights, said it "would be good for him to cooperate *if he wanted to*," and asked Duvall if he understood. Duvall answered in the affirmative. He was then fingerprinted and photographed. After some time Gniazdowski reappeared, around 7:00 p. m., and said, "The rights I told you a while ago still stand. I am going to ask you a few questions, Okay?" According to Gniazdowski, Duvall said "Yes." Duvall admitted owning the store and being president of

The Prodigal Son and paying bills with Treasury checks, but denied using the name "Benjamin Young" or seeing or signing one of the checks use of which was charged in the indictment.

By the time the questioning was over, the magistrate had gone. Duvall was taken to the West Street detention center at 7:21 p. m., where the typical prisoner voucher was filed.[4] The kitchen was closed and no effort was made to provide Duvall with food that evening.[5] Although the entry of Duvall's lodging at West Street indicated that he was to be removed at 9:00 a. m. for arraignment, he and the other defendants were not picked up until 10:58 a. m. They were first taken to the office of the Secret Service for return of their personal property and then to the office of the Assistant U.S. Attorney, where Gniazdowski, an Internal Revenue agent and a postal inspector were present. The Assistant U.S. Attorney admitted that the purpose of the interview was "to get information" from Duvall.

The Assistant U.S. Attorney informed Duvall of the offenses with which he was charged but did not mention that a complaint had already issued. Duvall testified that the Assistant U.S. Attorney had said the charges carried "a possible sentence of a hundred years"; the Assistant U.S. Attorney couldn't "say that I did not use that phrase or something like it." He read Duvall his "rights" from a form; he followed the reading of each "right" by asking whether Duvall understood it and noted "Yes." The form concluded with a question, "Understanding your rights as I have explained them, do you want to give me

---

**2.** The Government says "This procedure was necessary to insure that Duvall had no weapons on his person which had been missed during the earlier pat-down." It is hard to understand why a more thorough pat-down would not have done the job.

**3.** This reads:
I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

**4.** This form states:
This is your authority to detain the above-mentioned person in your custody until he is removed by an authorized representative of this agency for arraignment before the United States Commissioner or Judge of the following district.

**5.** Duvall testified that he overslept the breakfast hour on June 4 but asked the cook "for some coffee and a couple slices of bread." Counsel's brief (p. 11, note *) seems to concede that he got this.

some information at this time about your background and your version of the facts?" He recorded Duvall as having answered "OK you can ask your questions."

The Assistant U.S. Attorney told Duvall that in a few minutes he would be taken before a magistrate who would fix bail. Duvall testified that the Assistant had said "these cases don't usually go to Court" and that from this he drew the inference that if he answered the Assistant's questions the Assistant "was going to allow me to leave." The Assistant, whose memory of the episode was not particularly good, would not deny that he had sought cooperation but testified that if he had said anything on the subject, it was only that if Duvall cooperated, he would be permitted to plead to one or more felony counts and the nature and extent of his cooperation would be brought to the attention of the sentencing judge. The court did not resolve the conflict. Duvall proceeded to make further statements, most of them being false exculpatory ones. These included denials that he had ever paid suppliers with Treasury checks and that he had ever paid Holtzman Carpet with anything but cash—both of which assertions the Government demonstrated to be false at the trial. The interview lasted from 11:55 a. m. to 12:40 p. m. Duvall was arraigned about 2:00 p. m.—some 21½ hours after his arrest.[6]

The judge denied the suppression motion in a brief opinion delivered from the bench. He concluded that "the delay in arraignment was not unnecessarily long" and that Duvall "was not in fact so overwhelmed by the presence of guns that . . . he was

punch drunk or indeed by the other matters which happened, his being stripped at 90 Church Street." He found that "Mr. Duvall of course may have been frightened" but that "he was fully aware of what was going on in terms of what his rights were" both at 90 Church Street and certainly before the Assistant U.S. Attorney questioned him. He thought it was clear that Duvall didn't get any food, and was not sure why he didn't, but see fn. 5; however, he did not consider this was "terribly significant." The judge was willing to assume that Duvall "was told on more than one occasion about the possibility of facing a hundred years."[7] He specifically found, referring to the Secret Service form, that Duvall waived his right to a lawyer and knew what he was doing when he did so.

The judge observed that "it would have been better practice to have arraigned Mr. Duvall a little sooner."[8] And he was concerned about Duvall's having been told that he might face a sentence of a hundred years since, assuming the literal correctness of the statement, "it only tells part of the story." Finally he believed it would be well to give some thought to the question whether as a matter of standard practice it would not be desirable, instead of simply asking a defendant whether he understood his rights, to ask whether he wanted to waive them.

## II.

Duvall's most sweeping claim is that because a complaint under F.R.Cr.P. 3 had been filed before his arrest, his criminal prosecution had begun, any interrogation

---

6. Gniazdowski testified that even if a magistrate had been sitting the previous night, Duvall would first have been taken to see the Assistant U.S. Attorney, for reasons of "procedure."

7. We have found only one instance at which this remark was said to have been made, viz., during the Assistant U.S. Attorney's interview. The judge may have been lumping this together with Duvall's claim concerning Chodosh's threat about "not seeing the light of day" again.

Gniazdowski, who at the suppression hearing testified that he had been present during the

Assistant U.S. Attorney's interview, went on to deny at trial that the Assistant U.S. Attorney had made the statement that Duvall faced a one hundred year sentence. Yet Gniazdowski did not remember whether the Assistant had mentioned possible penalties or, if he had, what he had said about them.

8. While the judge referred to difficulties in getting people out of West Street and the overburdening of the magistrates, there was nothing to show that either of these factors contributed to the delay.

without the presence of counsel violated his Sixth Amendment rights under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), unless these were waived, and that conduct sufficient to constitute a waiver under *Miranda* does not suffice to waive *Massiah* rights unless the accused has been advised that he is the subject of a criminal prosecution, as held in *United States ex rel. Lopez v. Zelker*, 344 F.Supp. 1050 (S.D.N.Y.1972), *aff'd without opinion*, 465 F.2d 1405 (2 Cir.), *cert. denied*, 409 U.S. 1049, 93 S.Ct. 529, 34 L.Ed.2d 501 (1972), but see *United States v. Barone*, 467 F.2d 247, 249 (2 Cir. 1972) (*Miranda* form coupled, however, with telephone conversation with attorney—*Lopez* not discussed); *United States v. Diggs*, 497 F.2d 391, 393 & n.3 (2 Cir.), *cert. denied*, 419 U.S. 861, 95 S.Ct. 112, 42 L.Ed.2d 96 (1974) (distinguishing *Lopez* and stating that its affirmance without opinion has no precedential value).

Since the interrogation in *Massiah* occurred after indictment and, indeed, after the defendant had retained counsel, the Court did not have to concern itself with fixing the point at which a "criminal prosecution," as that term is used in the Sixth Amendment, had begun. The same was true of the lineups in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and in *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The Court had earlier held that a criminal prosecution might begin for Sixth Amendment purposes as early as arraignment when that was the only time when certain pleas or motions might be made, *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), see also *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158, 164 (1932), or a pre-arraignment preliminary hearing where a plea was entered, *White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963). It was later to hold that counsel was required at an Alabama preliminary hearing although the sole purpose of the hearing was to determine whether there was sufficient evidence to warrant presenting the case to the grand jury and, if so, to fix bail, since, for reasons indicated in the opinion,

this was nevertheless a "critical stage" in the criminal process. *Coleman v. Alabama*, 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387, 396 (1970).

In limiting the scope of *Wade* and *Gilbert* in *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), Mr. Justice Stewart distinguished the cases just cited as having "involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417. He continued, *id.* at 689–90, 92 S.Ct. at 1882, 32 L.Ed.2d at 417:

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

In his concurring opinion the Chief Justice said "that the right to counsel attaches as soon as criminal charges are formally made against an accused and he becomes the subject of a 'criminal prosecution.'" 406 U.S. at 691, 92 S.Ct. at 1883, 32 L.Ed.2d at 419.

In *United States ex rel. Robinson v. Zelker*, 468 F.2d 159 (2 Cir. 1972), *cert. denied*, 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973), a divided panel of this court held that the right to counsel at a line-up attached when a warrant of arrest issued under § 144 of the former New York Code of Criminal Procedure which provided that:

> A prosecution is commenced, within the meaning of any provision of this act which limits the time for commencing an action, when an information is laid before

a magistrate charging the commission of a crime and a warrant of arrest is issued by him, or when an indictment is duly presented by the grand jury in open court, and there received and filed.

However, the author of the *Robinson* opinion wrote for the court in *United States v. Counts*, 471 F.2d 422, 425 & n.4 (2 Cir.), *cert. denied*, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973), that there was "no reason . . . to reach the question whether the issuance of a federal arrest warrant may be likened to that of a New York state one." The Government's claim that the question thus reserved in *Counts* was decided in its favor by *United States v. Messina*, 507 F.2d 73 (2 Cir. 1974), *cert. denied*, 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975), in which this writer spoke for the court, is in error. Examination of the briefs shows that no claim of deprivation of counsel was made on the basis that a complaint had issued before Messina's arrest; the claim was that the Sixth Amendment was violated by the agents' dealing with him alone after he had been arraigned and counsel had been appointed. The decision in favor of the Government rested on the point that Messina, after having consulted counsel, deliberately decided to go through with a plan, formulated by him prior to arraignment, to allow the law enforcement officers to escort him home and receive sweaters he had offered to give them. On the other hand, we do not regard the discussion in *United States v. James*, 493 F.2d 323, 325–26 (2 Cir.), *cert. denied*, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974), as dispositive in Duvall's favor. It was there held that a defendant removed after a preliminary hearing before a United States Magistrate was "entitled to counsel promptly after his removal here on the charge made in the complaint . . . ." We deal in this case with the period after complaint and arrest but before arraignment. ▮ We see no reason in principle why the filing of a complaint should be deemed to give rise to a right to counsel immediately upon arrest pursuant to warrant. As said in 8 Moore, Federal Practice ¶ 3.02 (Cipes, 1975 rev.), "The principal function of

a complaint 'is as a basis for an application for an arrest warrant.'" See *Gaither v. United States*, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1076 (1969). There is no reason in the nature of things why an arrest warrant should need to be predicated on a complaint rather than simply an affidavit as in the case of a search warrant, F.R.Cr.P. 41; indeed Rule 4 permits the showing of probable cause for arrest to be made either in the complaint or in an affidavit or affidavits filed with the complaint. The requirements of Rule 5 bear equally on "an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant." We perceive no reason why Sixth Amendment rights should accrue sooner in the former instance than in the latter. Furthermore to hold that the accrual of the right to counsel is accelerated by use of the warrant procedure would tend to discourage this whereas the policy should be to encourage it.

### III.

This holding, of course, does not dispose of Duvall's arguments. We shall consider separately the questioning at the Secret Service office and by the Assistant United States Attorney.

Determination whether the statement to Agent Gniazdowski should be suppressed hinges primarily on two passages in *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. In one Chief Justice Warren stated:

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

In the other he said:

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be pre-

sumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

The Secret Service's waiver form, see note 3 *supra,* clearly was devised to meet the first sentence of the second extract. It would follow that, apart from questions of coercion and trickery later examined, suppression would not be required if Duvall's statements had "followed closely" upon his execution of the waiver.

■ In fact they did not. The waiver was executed about 4:20 p. m.; the questioning did not occur until more than two hours later. However, in the interval Gniazdowski had orally advised Duvall of his rights, asked if he understood, and elicited an affirmative response. And immediately before the questioning Gniazdowski had repeated that Duvall's rights still stood and said that he was going to ask a few questions, to which Duvall responded "Okay." If Gniazdowski's testimony as to this was believed—and Duvall did not contradict it—it would be caviling unduly to make anything turn on the lapse of time from the signing of the express waiver.

■■ Counsel makes much of Duvall's arrest at gunpoint, the roughing-up of his companion, and his being punched in the shoulder, and also of the strip search. The record affords no explanation of the need for so great a show of force, and although the prosecutor proffered one at argument, we shall disregard this. However, since an hour elapsed between the arrest and the signing of the waiver and another two hours between the latter and the interrogation, we cannot fault the finding implicit in the judge's general ruling that Duvall's will had not been overborne. Similarly while we find little merit in the Government's explanation of the need for a strip search, see note 2 *supra,* and contrast *United States v. Klein,* 522 F.2d 296 (1 Cir. 1975), this had ended some twenty minutes before the sig-

nature of the waiver and hours before the questioning. Moreover while the strip search in this case was an unnecessary indignity, it is a long way from the conduct in *Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945), where the police kept Malinski naked for three hours and only partially dressed for another seven, during which period his confession was obtained. Here again we must regard the judge's conclusion as including the strip search, and we cannot say it is clearly erroneous. See *United States ex rel. Fitzgerald v. LaVallee,* 461 F.2d 601, 604 (2 Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 121, 34 L.Ed.2d 142 (1972).

■ All that remains, so far as concerns the questioning on the afternoon of June 3 is Duvall's claim that before procuring his signature to the Secret Service waiver form, Agent Chodosh had told him he "would never see the light of day" unless he cooperated. As stated above, this claim was not contradicted at the hearing and the judge made no express finding about it. However, in light of the judge's more general findings we must conclude either that he did not credit Duvall's testimony, compare *LaVallee v. Delle Rose,* 410 U.S. 690, 695, 93 S.Ct. 1203, 1205, 35 L.Ed.2d 637, 641 (1973), or that he believed that the force of Chodosh's remark had been dissipated. Neither finding would be clearly erroneous.

We thus hold that suppression of the statements at the Secret Service offices was properly denied.

### IV.

■ We take a different view with respect to the interrogation by the Assistant U.S. Attorney. In reaching this conclusion it is not necessary to consider the general permissibility of the "pre-arraignment interview" procedure followed by the office of the United States Attorney for the Southern (and apparently also for the Eastern) District of New York.[9] Even if we

---

9. Despite the statement of the author of the opinion in *United States v. Ortega,* 471 F.2d 1350, 1362 (2 Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973), the

writer adheres to the view expressed in a concurring opinion in *United States v. Marrero,* 450 F.2d 373, 379 (2 Cir. 1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808

assume that routing through the prosecutor's office, for a last round of uncounseled interrogation, a defendant who will shortly appear before a magistrate and receive counsel is not a violation of *McNabb-Mallory* such interrogations are peculiarly likely to run afoul of *Miranda*. Such sessions are held for the very purpose of eliciting damaging statements which the first interrogation did not; indeed in the present case the Assistant U.S. Attorney admitted as much.[10] The official position of the prosecutor, the one person who can at this stage plausibly assert authority to grant favorable treatment to an uncounseled defendant, makes rigorous enforcement of *Miranda* peculiarly necessary at this stage. The facts of this case vividly illustrate the point: A defendant, arrested with considerable force on one day, interrogated and processed for the balance of that day, jailed for the night, returned to his interrogators for the trip to arraignment before a magistrate, suddenly finds himself closeted with an Assistant U.S. Attorney who, unbeknown to the defendant, had drawn up a

complaint against him before his arrest and was about to go before a magistrate to begin the prosecution. Unarraigned and uncounselled for 20 hours,[11] the defendant is taken through the questions answered the previous day, this time with a warning from the prosecutor that, if the case goes to trial, he can be sentenced to 100 years in prison. While not every "pre-arraignment interview," as the Government calls it—a term unknown to the Federal Rules of Criminal Procedure or the ALI's Model Code of Pre-Arraignment Procedure—combines all the features of this one, the Government should be alerted that such an interview should be conducted with strict regard for the rights of the defendant and free from any suggestions of pressure or threats. Prosecutors engaging in such a practice at least must be particularly scrupulous to observe the cautions of *Miranda* that the accused not be "threatened, tricked, or cajoled into a waiver," 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. The record here does not permit a finding that this high standard was observed.

(1972), that further interrogation on the merits by an Assistant U.S. Attorney when a prisoner is enroute to a magistrate after an already long period of interrogation constitutes "unnecessary delay" within F.R.Cr.P.. 5(a). The usual explanation, namely, that such interviews are needed to obtain the prisoner's "pedigree," hollow in any event with respect to interrogation designed to elicit evidence of guilt, is unavailable here since the Assistant U.S. Attorney already had sufficient "pedigree" information to have drawn a complaint. The explanation that the interview is needed to obtain information in regard to bail is similarly unconvincing. If that were the purpose, the interrogation should be limited to it; in any event there would seem to be no reason why such information should not be elicited before the magistrate as contemplated by F.R.Cr.P. 5(c). In the present case, the defendant was asked some questions material to a bail inquiry; but at least some of his answers (that he had a heart condition, that he had never used drugs) were not conveyed to the magistrate.

It is not clear whether *United States v. Collins,* 462 F.2d 792 (2 Cir.) (order granting rehearing *in banc* vacated as improvidently granted) (2 Cir.), *cert. denied,* 409 U.S. 998, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972), precludes continued adherence to these views. It also is not clear whether *Collins* held that 18

U.S.C. § 3501 repeals *McNabb-Mallory* even when the delay exceeds that allowed by § 3501(b) or when the statement is a false exculpatory statement rather than a confession. Compare 462 F.2d at 796 with *id.* at 798 n. 2 (dissenting opinion).

The whole matter discussed in this footnote may be of largely academic interest if we should agree with the substantial body of authority that a waiver valid under *Miranda* also waives rights under *McNabb-Mallory.* See *Frazier v. United States,* 136 U.S.App. D.C. 180, 419 F.2d 1161, 1166–67 (1969); *Pettyjohn v. United States,* 136 U.S.App.D.C. 69, 419 F.2d 651, 656 (1969), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970); *O'Neal v. United States,* 411 F.2d 131, 136 (5 Cir.), *cert. denied,* 396 U.S. 827, 90 S.Ct. 72, 24 L.Ed.2d 77 (1969); *United States v. Lopez,* 450 F.2d 169 (9 Cir. 1971), *cert. denied,* 405 U.S. 931, 92 S.Ct. 985, 30 L.Ed.2d 805 (1972).

**10.** Asked what the purpose of the pre-arraignment interview had been, the Assistant U.S. Attorney replied, "To get information—to advise Mr. Duvall."

**11.** Asked if there had been an attorney present during his interview with Duvall, the Assistant U.S. Attorney replied, "Yes. Myself."

Duvall testified that the Assistant U.S. Attorney had told him that the charges carried "a possible sentence of a hundred years." The Assistant "couldn't say" that he hadn't. The judge assumed that the Assistant had said what Duvall claimed. The judge was concerned about this since although the remark was correct as a matter of multiplication because of the large number of counts, "it only tells part of the story." How small a part is indicated by the fact that, after clear proof of guilt, the judge imposed a prison sentence on only one count. This was for three years, with execution of two years (later changed to two and a half years) suspended.[12] The prosecutor must have known, as the defendant did not, that no judge would impose—indeed that no prosecutor would seek—a sentence for the crimes here charged remotely approaching a hundred years, and that a hundred year sentence thus was not "possible," in any real sense. Yet a defendant might fear at least that the prosecutor would ask for a very long sentence if he did not "cooperate." Such a remark by a prosecutor to an uncounseled defendant from whom he is seeking a waiver of Fifth Amendment rights calls for something more than an expression of judicial concern. The statement to the Assistant U.S. Attorney should have been suppressed.

### V.

We thus reach the question whether the failure to direct suppression of the statement to the Assistant U.S. Attorney requires reversal.

We agree with the statement of Duvall's counsel at the suppression hearing that the Government had a "ton of evidence" against the defendant. The facts of the issuance of the Treasury checks, their theft and the subsequent forgeries of endorsements were not disputed. Duvall's sole contention was that he lacked guilty knowledge; that the checks must have come to the grocery store via patrons and were unwittingly passed along. The jury was asked to conclude this from the plausible proposition that no one would knowingly give a forged check to a business acquaintance—here principally the wholesale food suppliers—since the defrauded persons would simply return demanding their money. This argument was not buttressed by defense testimony and, depending on the evidence, the jury might as reasonably have concluded that the defendants were counting on some payees not returning, considered the forged checks as providing a kind of interest-free loan or even thought that, in a highly mobile society, they could simply close down one grocery and open up somewhere else, thereby evading angry creditors. We turn then to the evidence with respect to Duvall's guilty knowledge.

The payees of eight checks were called by the Government: Wilson, Gluck, Ronan, Weideger, Gordon, Gregory Gustavson and Milton Gustavson and Vazquez. They testified that Treasury checks made out to them had either not been received or had been stolen after receipt; that these checks had not been endorsed by them or with their consent. The Vazquez and Gluck checks were given by Duvall to two merchants, both of whom testified. More damaging were the testimony of a bank teller and photographs of Duvall standing before her, establishing that Duvall had deposited the Ronan, Weideger and Gordon checks in an account under the name "Benjamin Young." This reinforced the testimony of an employee of another merchant that Duvall had endorsed the Wilson check in the name of Benjamin Young. A Secret Service handwriting expert testified that the "Benjamin Young" signatures on the Wilson, Ronan, Weideger and Gordon checks were likely written by the same person; that the same person had probably also forged the endorsements of the payees on the two Gustavson checks; and that, on the basis of a handwriting exemplar of the defendant, that person was probably Duvall.

This was a formidable case, quite independent of any statements by Duvall. The

---

**12.** The sentence on this count included two years probation to begin on expiration of confinement. On the other counts the sentence was two years of concurrent probation.

chief effect of the statements was to preclude the defendant to some extent from explaining his use of the name "Benjamin Young" because he had so adamantly claimed during interrogation that he had never heard such a name.

Judge Stewart charged:

There has been testimony that the defendant Duvall may have used the name Benjamin Young in negotiating Treasury checks. If you find that he knowingly used the false name in order to conceal his true identity and avoid identification, that is a fact from which you may, but need not infer consciousness of guilt on his part.

There has been evidence in this case that after his arrest, Thomas Duvall made certain statements to Secret Service Agents and to . . . an Assistant United States Attorney. The Government claims that some of those statements are admissions and that some are false exculpatory statements . . . [Y]ou may consider such a false statement as circumstantial evidence from which consciousness of guilt or criminal intent may be inferred.

If the false exculpatory statements had occurred during the Assistant U.S. Attorney's interview alone, the question whether Duvall's conviction could stand might be of some difficulty. But the Gniazdowski interview elicited the statements from Duvall that he had never signed "Benjamin Young," had never used the name, had never heard it; that he had never seen the Ronan check endorsed "Benjamin Young," had not signed it, had never touched it. Our concern therefore is not with the effect of all of Duvall's false exculpatory statements but with the incremental effect of his statements to the Assistant U.S. Attorney over and above those to Agent Gniazdowski. Despite the references to these in the prosecutor's summation, we think it would be unreasonable to suppose that the mere repetition of the falsities told Gniazdowski would affect a predestined result.[13]

▆▆▆ In short we are convinced that the error in failing to suppress the statement to the Assistant U.S. Attorney was harmless beyond a reasonable doubt. Compare *United States v. Nussen,* 531 F.2d 15, 21 n. 5 (2 Cir. 1976).

Affirmed.

13. We note that the jury had no difficulty deciding to convict Jones who was less extensively implicated and had made no statements. Porter, who was interrogated, was acquitted on the basis of a defense the principal thrust of which was that he was merely an employee of the true culprit, Duvall.