**UNITED STATES of America**

v.

**Nelson RONDON and Ernest Baez, Defendants.**

**No. 85 Cr. 78(PNL).**

United States District Court, S.D. New York.

May 10, 1985.

Douglas F. Eaton, New York City, for defendant Baez.

Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., New York City, for plaintiff; Herve Gouraige, Ass't U.S. Atty., New York City, of counsel.

## OPINION AND ORDER

LEVAL, District Judge.

This is a motion by defendant Ernest Baez to suppress statements made by him to an Assistant United States Attorney after his arrest and before his arraignment. The motion is based on two grounds. The first seeks to suppress a portion of the interview on the contention that the Assistant continued questioning after the defendant expressed the wish to consult counsel. The second attacks the entire interview on the contention that such questioning by the prosecutor before arraignment violates the Constitution and Rule 5(a), Fed.R.Crim.P.

The motion is denied on the second ground, but granted on the first.

Baez was arrested by the New York City Police at 107 E. 110 Street on January 2, 1985 shortly after 2:30 p.m. after selling a

packet of cocaine to an undercover New York City police officer. By arrangement between the federal and local authorities, defendants arrested that day by the New York City Police for drug sales in Manhattan were to be prosecuted by the United States Attorney in federal court. The defendant was taken by the arresting officers to the 26th Precinct for processing. (Ordinarily booking and processing would have been done at the 23rd Precinct. That day all such narcotics arrestees were taken to the 26th where an Assistant U.S. Attorney was posted.) After completion of processing at the precinct, the defendant was taken downtown by the arresting officers to the U.S. Courthouse, where he arrived at 5:50 p.m. He was taken directly to the office of an Assistant U.S. Attorney. The evidence showed that the U.S. Magistrates had issued a policy to the United States Attorney to the effect that magistrates would remain available each evening for the arraignment of defendants who arrived in the building before 5:00 p.m. but would put over to the next day those who arrived after 5:00 p.m. Accordingly, as of the defendant's arrival, it was clear he would not be arraigned that evening.

The office policy of the United States Attorney since *United States v. Perez*, 733 F.2d 1026 (2d Cir.1984), has been to interview arrested defendants before their arraignment if such interview would be within six hours of the arrest. The Assistant accordingly proceeded to interview the defendant. He first gave the *Miranda* advice, elicited Baez' agreement to answer questions (telling him he could choose the questions he wished to answer and could "stop at any time"), and went ahead with questioning. Following the office form, the Assistant began with questions about the defendant's occupation, address, family, schooling, prior employment, roots, criminal record, financial condition, etc., all being pertinent to the issue of the Government's bail recommendation to be made to the magistrate.

The Assistant then asked whether Baez had any complaint as to how he was treated by the arresting officers. His answer, according to the notes and testimony of the Assistant, was that he would "talk to Legal Aid about that." (Baez testified at the suppression hearing that his answer had been that he wanted a lawyer before he answered any more questions. I accept the Assistant's and not the defendant's version of this interchange.)

The Assistant then moved on to the part of the form that calls for questioning about the offense. The form calls for the question, "Would you like to tell me what happened?" The Assistant testified that he may have deviated from the prescribed form and simply asked, "Okay, what happened?" Baez made a number of incriminating statements. He admitted awareness of about 20 or 30 packets of cocaine, two capsules of cocaine, a bag of marijuana, and 29 hypodermic needles in his apartment. When asked whether he was going to sell the cocaine, he said, "I'm not going to answer that." The interview continued and the defendant made further damaging admissions.

The arraignment would normally have occurred first thing the next day. Because of the large number of City police narcotics arrests diverted into federal court, the Magistrates court and its system for appointing counsel were overtaxed. Baez did not obtain counsel until afternoon and was not arraigned until late in the day.

### Discussion

#### I

I find that the Assistant, who was new to the job at the time of the interview,[1] made certain errors of judgment that require suppression of the incriminating statements.

■ When the defendant said, in response to the inquiry whether he had complaints about his treatment by the police, that he would "talk to Legal Aid about that," this should have raised two warning

---

1. Not the same Assistant who appeared for the trial of the action.

flags. First, the answer tended to suggest mistreatment by the police. Claims of misconduct should, if possible, be evaluated to determine whether prompt investigation is called for. Also, if the complaint was a fabrication, the answer warned of a possible attack on whatever statement might be given to the Assistant based on a claim of coercion by the police.

I do not offer suggestions as to what would have been the best course for the Assistant to follow under the circumstances. Nor do I dwell on that aspect of the problem as no claim of police misconduct later materialized. I suggest only that the Assistant's disregard of this warning was not the best course.

 The second, and now more pertinent, warning flag was the possible implicit suggestion that the defendant wanted then to talk to a lawyer. The Assistant interpreted the answer "I'll talk to Legal Aid about that" as placing emphasis on the "about that" and indicating no unwillingness to answer without counsel on other subjects. Thus the Assistant made no effort to ask questions seeking to interpret the defendant's comment or inquire whether defendant remained willing to answer other questions without counsel, but moved on directly to the substantive portion of the interview. Furthermore, as noted above, he rephrased the question dictated by his office form, substituting "Okay, what happened?" for "Would you like to tell me what happened?"

The procedure was mistaken in two respects. Assistants should not treat *Miranda* warnings as a mere textual formality to be recited on the way to eliciting a confession. The government will have the burden of proving an understanding waiver by the defendant of his right not to be questioned. When a questioned suspect makes a tentative, ambiguous or unclear reference to a desire for legal advice, Assistants should not brush these aside interpreting them in the manner most favorable

to the government, but should probe the issue to ascertain whether the defendant continues to be willing to answer questions without counsel. *See United States v. Chansriharaj*, 446 F.Supp. 107 (S.D.N.Y. 1978).

Furthermore, by changing the formulation of the next question, the Assistant reduced the emphasis of the questions on the defendant's willingness to continue. He eliminated the aspect of the question that inquired of the defendant's willingness and adopted a form that is more like an inquisitorial demand.

And, when once again during the interview the defendant said he didn't want to answer a question, the Assistant simply proceeded to the next question, without effort to ascertain whether the defendant understood that he had the right to terminate the interview until represented.

The Government has not sustained its "heavy burden ... to demonstrate that the defendant knowingly and intelligently waived" his right to terminate the interview until such time as he would be provided with counsel. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *U.S. v. Duvall*, 537 F.2d 15, 22–25 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). Otherwise put, referring to the factors dictated by 18 U.S.C. § 3501, I find the Government's proof insufficient of its meaningful satisfaction of § 3501(b)(4).[2] The admissions following the reference to Legal Aid are accordingly ordered suppressed.

## II

The defendant's motion to suppress based on illegality of the U.S. Attorney's pre-arraignment interview is largely mooted by the ruling made above, as the incriminating statements the government wishes to offer occurred after the defendant's reference to Legal Aid. I nonetheless rule

---

**2.** Because the deficiencies discussed above are sufficient to warrant suppression, I need not consider the effect, if any, of the following day's delay of arraignment. See 18 U.S.C. § 3501(b)(1).

and comment on this issue which has been the subject of recent debate.

Two opinions of the Court of Appeals have questioned the lawfulness of U.S. Attorney's pre-arraignment interviews on constitutional grounds, but have stopped short of ruling the practice illegal. *United States v. Perez*, 733 F.2d 1026 (2d Cir.1984); *United States v. Foley*, 735 F.2d 45 (2d Cir.1984).

In *Perez*, the interview had been conducted eight hours after the arrest. Judge Weinfeld had found the delay unreasonable and suppressed the defendant's statements. The Court of Appeals affirmed, ruling that under § 3501 such a delay of more than six hours between arrest and questioning is sufficient basis to justify suppression. In *Foley*, the Legal Aid lawyer who was about to be appointed had telephoned to the Assistant and demanded that the defendant not be interviewed; the Assistant had disregarded this demand. The defendant's statement was not suppressed, but the Court of Appeals criticized the practice of conducting pre-arraignment interviews.

I have no disagreement with the suppression in *Perez* based on the delay. Indeed, in my view, as Judge Lumbard noted in a separate opinion, the *Foley* court might properly have gone farther than it did and suppressed the statement based on the Assistant's disregard of the lawyer's demand: although the attorney had not yet been formally appointed, he had already started to act on the defendant's behalf. The Assistant might thus be found to have violated the defendant's right, upon his lawyer's demand, to have the questioning terminate. *See* 735 F.2d at 49–50 & n. 1 (Lumbard, J., concurring).

I have no disagreement with the Court of Appeals' criticism of those aspects of the conduct of the U.S. Attorney, but must respectfully disagree with the further comments in both opinions questioning whether the pre-arraignment interview is inherently an unconstitutional practice.

█ In my opinion the practice of pre-arraignment interview by the Assistant, as-

suming it is done with scrupulous respect for the defendant's rights, is a lawful procedure offering valuable benefits to the enforcement of the criminal laws while offering certain potential advantages to defendants as well. Its lawfulness, furthermore, is emphatically endorsed by act of Congress.

█ 1. Although it is sometimes argued that the pre-arraignment interview is incompatible with the command of Rule 5(a), F.R.Crim.P., that the arrested person be taken "without unnecessary delay before the nearest available federal magistrate," this argument is overridden by 18 U.S.C. § 3501, passed in 1968 in response to the Supreme Court's *Miranda* ruling, 384 U.S. 436, 86 S.Ct. 1602 (1966). The statute provides that an incriminating statement "shall be admissible in evidence if it is voluntarily given," and "shall not be inadmissible solely because of delay in bringing [the defendant] before a magistrate" if the delay between arrest and arraignment is less than 6 hours. A number of delays for law enforcement purposes, including fingerprinting, questioning by agents and other processing, are not "unnecessary delays" if done with reasonable dispatch. Such questioning by a prosecutor within 6 hours falls in the same category.

Two opinions by Judge Friendly in the 1970s, *United States v. Marrero*, 450 F.2d 373, 379 (2d Cir.1971) (concurring opinion) and *United States v. Duvall, supra*, 537 F.2d 15 (2d Cir.1976), commented on the long standing conflict between the U.S. Attorney's practice and the obligation to provide a prompt arraignment, but recognized that the recent enactment of § 3501 ruled out a finding of illegality by reason of violation of Rule 5(a), so long as the 6 hour limit of the statute was observed. *See Duvall*, 537 F.2d at 23–24 & n. 9. Judge Friendly cautioned prosecutors to be "particularly scrupulous to observe the cautions of *Miranda*," 537 F.2d at 24; I have no disagreement with his criticisms of delays and overreaching by the prosecutors on those facts. But I note that neither opin-

ion in any way endorses or supports the constitutional arguments discussed in *Perez* and *Foley*.

2. A point emphasized by the *Perez* and *Foley* opinions is discriminatory impact against the poor. The reasoning starts with the observation that defendants known to be represented by private counsel are not questioned by the prosecutor. It is therefore concluded that "the practice is invoked only against a defendant who is poor and unrepresented." 735 F.2d at 48. In consequence, it is argued that such questioning is constitutionally suspect in its "potentially discriminatory impact . . . upon indigent defendants." 735 F.2d at 49. I believe this argument is flawed in several respects.

The fact that defendants known to be represented are not questioned does not mean that the indigent are most often questioned, much less that the practice "is invoked only against . . . [the] poor. . . ." 735 F.2d at 48. Most persons in our society have sufficient resources to be ineligible for CJA funding but do not have lawyers on retainer. Such a person will be questioned by the United States Attorney. On the other hand, many offenders (particularly in the area of narcotics) are repeaters who have been previously arrested in either the federal or the state system. If indigent, they have appointed lawyers. It is not clear whether they would be questioned on stating that they have a lawyer. It is certainly not the case that only the poor are questioned and far from clear that the questioning falls more heavily on the indigent.

■ But even if this were the case, I would find it difficult to accept the further reasoning. It suggests a conclusion of unconstitutional discrimination based on the observation that indigent defendants who depend for appointment of counsel on the Criminal Justice Act do not obtain all the advantages available to wealthier defendants who hire their lawyers. I believe this is not, and cannot be, the appropriate test. The Constitution guarantees that the poor will have representation of counsel fur-

nished to them at the critical stages of the prosecution. It does not guarantee, nor does our system provide, that this representation will be equivalent to what is available to the wealthy. Necessarily, there are numerous distinctions and disadvantages. The wealthy may hire whatever lawyer will agree to accept their retainer; the indigent have no choice but must accept whoever is assigned by the court. The wealthy may hire teams of lawyers; the indigent (in all but the most demanding cases) are served only by one. The wealthy client may offer his lawyers terms to induce them to devote their primary attention and energies to the defense of his case; the indigent can pay only the statutory fee available under the Criminal Justice Act. One could go on. The Supreme Court made clear in *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) that the constitutional right to counsel does not imply entitlement to all the advantages of counsel that may be privately retained. What our standard requires is representation at the critical stages of prosecution, *i.e.*, upon arraignment, and after indictment, *see Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), not parity with those who retain counsel. Parity is an impossible goal. It cannot be achieved and should not be used as a standard of lawfulness. If it is employed as a standard, then our entire system flunks the test.

3. *Perez* and *Foley* further question whether the interview should be found unconstitutional because of a "unique chilling effect . . . on a defendant's right to testify,"—the capacity of the defendant's statements to "commit [him] to a 'story' or position that would restrict his options at trial, including his option to testify in his own behalf." 735 F.2d at 48, 49. I do not think such an argument can be supported.

As Judge Lumbard noted in *Foley*, the defendant's *right* to elect to testify is not restricted. 735 F.2d at 50. The Constitution guarantees that right. It does not guarantee that the prosecution will not investigate so as to disprove a fabricated

alibi. That is what the interview of the defendant accomplishes. If he has confessed the crime, he may indeed see little point in taking the stand to deny it. If he has given one alibi, he may see little value in taking the stand to give a new and better one. It could not seriously be argued that a defendant's right to testify was impaired by a thorough police investigation that revealed the falsity of his intended alibi. I don't see why the interview stands on a different footing. His right to testify is fully preserved, albeit the potential benefits of giving fabricated testimony on the stand have been reduced.

4. *Foley* also questions the practice because it "aid[s] the prosecutor and harm[s] the defendant" by the obtaining of "admissions from the defendant which would not be forthcoming once an attorney enters the picture...." 735 F.2d at 48.

I agree that counsel would routinely dissuade their clients from making admissions, and that defendants would often have a better chance of acquittal if they had not answered the prosecutor's questions. I do not understand why this makes the practice either illegal or undesirable.

*Foley* does not suggest that the evidence produced by such admissions is unreliable. To the extent that it helps produce convictions and guilty pleas, there is no suggestion that it has any tendency to convict the innocent. To the contrary, the practice is a valuable and effective investigative tool for producing strong evidence against guilty defendants. It increases the likelihood of conviction of the guilty; it decreases their opportunity to fabricate perjurious explanations, and it increases the likelihood that the defendant will plead guilty.

In my view, the purpose of appointment of counsel is not, like a golf handicap, to give the weaker player a better chance of winning. It is to fulfill a condition found necessary to a fair proceeding: that the defendant have skilled assistance at the crucial stages of the prosecution. The Sixth Amendment has not been held to require that an arrested suspect have counsel when questioned. The Supreme Court has often spoken on the subject and ruled to the contrary. *Miranda v. Arizona* authorizes the questioning of unrepresented arrested suspects if they have received explanation of their rights and agree to proceed. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), specified that the right to counsel does not attach until arraignment, indictment or other adversary judicial proceedings.

Arrested suspects are routinely questioned without counsel before arraignment by police officers and federal agents. Such questioning is lawful if lawfully conducted. I can see no reason why the case should be any different simply because the questioning is by the prosecutor. To the contrary, such questioning by the Assistant gives greater assurance that the defendant will be fully and meaningfully advised of his rights, that oppressive tactics will be avoided and that the defendant's answer will be accurately preserved without distortion. We employ prosecutors to investigate crimes thoroughly and prosecute them both fairly and effectively. In questioning an arrested suspect prior to arraignment, the Assistant is using a civilized and lawful technique for obtaining evidence of the most reliable sort to help secure the conviction of guilty offenders. That, it seems to me, is just what a prosecutor should be doing.

Furthermore, such questioning precedes the decision to prosecute. It is not merely formalism to say, in accordance with *Kirby v. Illinois,* that the right to counsel has not attached, for at this time the prosecutor has nothing more than the judgment of the agent or police officer that probable cause warranted an arrest. 406 U.S. at 689–90, 92 S.Ct. at 1882. The prosecutor may disagree, or even if he agrees, may think the prosecution unwarranted as a matter of discretion. Although it is true the defendant is in custody (as the result of a police officer's decision), no prosecutorial decision has been made at this point to seek an indictment. It is appropriate that there be no constitutional right to counsel at this stage and that questioning be permitted of

the arrested suspect, as provided in § 3501, whether by the police or by the prosecutor, so long as the obligations of *Miranda* and of arraignment without unnecessary delay are scrupulously observed.

5. The *Foley* opinion (but not *Perez*) also discusses ethical problems under Disciplinary Rule 7–104(A)(1) of the ABA Code of Professional Responsibility. It must be that this observation referred to the Assistant's disregard of the demand of the lawyer who was waiting to be appointed. The rule could not be infringed by questioning of a suspect who is known to be *unrepresented,* for the rule prohibits a lawyer from unauthorized communication "with a party *he knows to be represented by a lawyer.*" 735 F.2d at 48 (emphasis added). Those observations were pertinent to the *Foley* facts, but I believe they have no reference to the general practice of questioning unrepresented suspects prior to arraignment.

6. Both opinions seem to attach significance to the belief that the U.S. Attorney for the Southern District of New York is the only federal prosecutor who interviews unrepresented arrested suspects before arraignment. The Court of Appeals apparently relied for this proposition on a reference in a district court opinion, *U.S. v. Restrepo-Cruz,* 547 F.Supp. 1048 (S.D.N.Y. 1982), to an internal memorandum written by a magistrate to his colleagues which stated without cited source that the Southern District office was "apparently the only federal prosecutor's office in this country which still adheres to the practice of conducting prearraignment interviews." 547 F.Supp. at 1064.

A few telephone calls made to U.S. Attorneys' offices suggest that the Southern District office is by no means alone in conducting such pre-arraignment interviews (although it may do so in a larger percentage of cases than other offices). Several other offices responded that they conduct such interviews, particularly in important cases and cases in which it is hoped the suspect will cooperate.

My sampling revealed that a number of offices had dropped or reduced the practice in recent years—not because it was thought improper, but to avoid complications that result from the Assistant becoming a witness.

7. Although a major purpose of the interview is, no doubt, to gather strong evidence to support the prosecution of the offense, it has other values some of which benefit defendants. As Judge Lumbard noted, a pre-arraignment interview helps the Assistant make an early evaluation of the case which sometimes leads to a decision not to prosecute, either because of insufficiency of proof or for discretionary reasons. *Foley,* 735 F.2d at 50. Frequently the interview leads the Assistant to take a more accommodating position on bail when the defendant communicates his reliability as a bail risk, as well as on the possibility of deferred prosecution. It provides the defendant with an opportunity to agree to cooperate and to obtain the benefits of the Witness Protection Program for himself and his family—an opportunity that often disappears once the defendant is represented by counsel because of the defendant's worry that his cooperation might become known. It permits the prosecution to learn promptly of misconduct by law enforcement officers and take proper steps to investigate.

Also, it is worth noting from the court's point of view that such interviews greatly diminish frivolous litigation. Defendants who have acknowledged to the Assistant that they were properly treated by the arresting officers are less likely then to invent unfounded accusations to furnish the basis of frivolous but time consuming suppression motions. And, as noted above, defendants who have admitted guilt are less likely to demand trials to test the persuasiveness of the Government's proof or of subsequently concocted alibis. These benefits to the courts and public, as well as to law enforcement, are considerable.

I would add as a caution that a decision invalidating pre-arraignment interviews by prosecutors on the constitutional grounds discussed in *Perez* and *Foley* would deal a serious blow to the prosecution of violent

crimes by local law enforcement. It is a common practice in local law enforcement, especially as to serious crimes of violence such as murders, rapes and armed robberies, for assistant district attorneys to question arrested suspects prior to arraignment and appointment of counsel. This is, in my view, a desirable practice which helps appraise the quality of the evidence before a prosecutorial decision is made and obtains valuable evidence of the most serious offenses, while giving assurance that the rights of arrested suspects have been respected in the questioning. The expected intervention of the prosecutor at this stage, furthermore, is a significant inducement to the police to deal with the suspect in accordance with the law.

\* \* \*

For all the reasons given above, I find no unlawfulness in the fact that defendant was questioned by the prosecutor before arraignment. That aspect of his motion is denied.