UNITED STATES of America,

v.

Adolfo RESTREPO–CRUZ and Joyce
Tahany, Defendants.

No. S 81 Cr. 295 (MJL).

United States District Court,
S. D. New York.

July 9, 1982.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City by Andrew J. Levander, Asst. U. S. Atty., for plaintiff.

Dominic A. Villoni, Corona, N. Y., for defendant Adolfo Restrepo-Cruz.

Caesar D. Cirigliano, New York City, Federal Defender Services Unit, The Legal Aid Society by Leonard F. Joy, New York City, for defendant Joyce Tahany.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

The defendants Adolfo Restrepo-Cruz ("Restrepo") and Joyce Tahany ("Tahany") are charged in an indictment with the crimes of conspiracy to distribute and possess valium in violation of 21 U.S.C. § 846 and distribution and possession of eleven valium pills in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(2). The defendant Restrepo is also charged with possession of .3 grams of cocaine in violation of 21 U.S.C. § 844(a).

The defendant Restrepo moved the Court to suppress various items seized by the Federal Express Company ("FEC") from the mails, other items seized by Drug Enforcement Administration ("DEA") Special Agents from his home and statements made to Assistant United States Attorney Rich-

ard A. Martin ("AUSA Martin"). The defendant Tahany moved to suppress statements made to DEA Special Agents.

## BACKGROUND

### I.

*Events Prior to Arrest*

On April 2, 1981, DEA Special Agent John Reape was informed by the FEC that an employee had made a search of four small boxes, insured for $20,000. The boxes were considered suspicious because of their small size in comparison to the amount of insurance. The search revealed that the boxes contained a quantity of white pills, marked "Lemmon 714," and $16,700 cash. The boxes were addressed to Adolfo Restrepo, 324 East 77th Street, Apartment 1–D, New York, New York, and were sent from Barry J. Andre, c/o Sun Song Productions, 11 Massie Avenue, Providence, Rhode Island.

Special Agent Reape was also informed by an employee of FEC that on April 2 a caller, who gave the name Joyce Tahany, phoned his office several times inquiring about the boxes addressed to Restrepo, which she said contained watches and important papers. The FEC employee told the caller that the packages were lost. The caller left a phone number where she could be reached when they were found. That number was listed in Restrepo's name.

Special Agent Reape and another agent went to the FEC office, took possession of the boxes and cash and returned to the DEA office where the boxes were restuffed with paper, eleven of the original pills and aspirin. Special Agent Reape went to the office of AUSA Martin the next day and told him of the preceding day's events.[1] AUSA Martin authorized a controlled deliverance. With his assistance, Agent Reape filed a complaint and secured arrest warrants for Restrepo and Tahany.

Special Agent Reape then went to the FEC office, obtained a uniform, an FEC van and a driver. He returned to the DEA

---

1. By this time Reape had procured a laboratory report which showed the pills to be valium.

office where he was joined by DEA Special Agents Ruth Higgs, Camille Colon, Fred Sandler and Robert Joura. They proceeded to 324 East 77th Street. Special Agent Reape pressed the outside buzzer, announced a Federal Express delivery, was let into the building and rang the bell to apartment 1D. A male in pajamas answered the door and said he was Restrepo and was expecting the delivery. Special Agent Reape handed Restrepo the packages and obtained his signature. While standing at the open door, Reape observed a female, later identified as Joyce Tahany, lying across a couch and overheard her saying "they're here now" into a telephone.

Special Agent Reape left the apartment and joined the other agents outside. About ten minutes later, he returned to the apartment building and again buzzed. The woman whom he had previously observed opened the vestibule door. Reape told her that Restrepo's signature did not come through on his receipt. Special Agents Joura and Sandler then entered the hallway. When Tahany asked if she could help them, the agents identified themselves, drew their guns and informed Tahany that she was under arrest and that they had an arrest warrant for her and Restrepo. About this time Special Agents Higgs and Colon entered the hallway and took custody of Tahany, who was then handcuffed.

Special Agent Joura asked Tahany for the door key. When she said she didn't have it, Joura knocked on the door and said, "Police, open up." When he got no response, he knocked on the door again and said, "Open up or else I'll break the door down." Tahany then yelled, "Open up, Adolfo, it's the police." [2]

## II.

*Events Inside the Apartment*

Restrepo opened the door, still in his pajamas. Special Agents Reape, Joura, Sandler and four other agents entered the

2. Transcript of Suppression Hearing, dated November 16, 1982, at 105 (hereinafter "Tr.

apartment with guns drawn. As Reape was telling Restrepo he had an arrest warrant for him, Joura went to the back of the one-room apartment, and looked in the bathroom, kitchen area and closets. Special Agent Reape testified that he observed the FEC packages he had previously delivered, open and with some of the contents on a table. Reape took possession of those packages.

The government contends Restrepo voluntarily consented to a search of the apartment which resulted in the seizure of other incriminating evidence. The government further contends that both defendants waived their *Miranda* rights and made incriminatory statements. The defendants contest these claims.

## III.

*Testimony Concerning Defendants' Fourth and Fifth Amendment Claims*

Special Agent Reape testified that after entering the apartment he went over to a table and examined the FEC boxes. Tr. 108, 112. He observed Restrepo and Tahany seated on a couch nearby. Tr. 111. Special Agent Joura asked defendants if they understood English. Tr. 116. They said "yes." Then Special Agent Sandler began giving them the *Miranda* warnings. According to Reape at the first hearing, Special Agent Sandler asked "if they elected to waive the rights of advice to counsel and the right to remain silent, the right to an attorney . . . ." Tr. 118. Mr. Restrepo answered, according to Reape, "no, he did not wish to waive a right." Tr. 118. Reape further testified:

Q And what did Miss Tahany say?
A She said no, she did not wish to waive her rights.
Q Then what happened?
A They were asked if they wanted to answer any questions . . . .
. . . .
A Mr. Restrepo said he would cooperate at that point.

——.").

. . . .

A [H]e said "I'll answer questions." [sic]

Q What did Miss Tahany say, to your knowledge?

A Miss Tahany said she didn't know what this was all about.

Tr. 118–20.

After the hearing concluded, this Court examined the extensive transcript and exhibits. The Court reopened the hearing because the Court wished to take further testimony from AUSA Martin and to call Magistrate Raby, who presided at the arraignment. At the conclusion of the testimony of these witnesses, AUSA Levander made an application to recall Agent Reape "to ask Agent Reape about what the government suggests to your Honor was a slip." Transcript of Supplemental Hearing at 43 (hereinafter "Supp. Tr. ____"). AUSA Levander explained:

The point of the misstatement, the only things I allege that are misstatements are the two statements I read to the Court on page 118 in which Agent Reape, in all due respect, misstates himself and says they said—talking about each one individually—he did not wish to waive his rights and she did not wish to waive her rights. That is the misstatement we are talking agout. [sic]

Supp. Tr. 53–54.

Over objection of both defense counsel, the Court permitted the government to recall Agent Reape. The witness testified that at the end of his testimony at the prior hearing, he returned to AUSA Levander's office, and that Mr. Levander asked the witness if he was aware he had testified that the defendants did not waive their rights at the time they were arrested. The witness testified that he then told Mr. Levander that that was a misstatement.

During that same week Agent Reape had a further discussion with AUSA Levander concerning his testimony. When asked about the substance of that conversation, the witness replied:

Basically the same thing—that there was an inconsistency with the fact that I said that the defendants did not elect to waive

their rights, as opposed [sic] to electing to waive their rights.

Supp. Tr. 73. The witness further testified that he went over the transcript of his former testimony with AUSA Levander on two occasions prior to testifying at the supplemental hearing.

Agent Reape concluded his testimony as follows:

THE WITNESS: As I can recall, Agent Sandler asked Mr. Restrepo and Ms. Tahany—

THE COURT: Together you told us.

THE WITNESS: He asked them together, and they answered separately, if they understand that they had a right to remain silent. Mr. Restrepo indicated or said that he did. Ms. Tahany said she did understand the rights. Agent Sandler in substance asked if they understood they had a right to an attorney, and Mr. Restrepo said that he understood. Ms. Tahany indicated that she understood or said she understood.

They also were told by Agent Sandler that if they could not afford an attorney one would be appointed for them by the Court. Mr. Restrepo said that he understood and Ms. Tahany said that she understood.

THE COURT: Anything else you recall?

THE WITNESS: Not that I can recall, your Honor? [sic]

THE COURT: Anything at all? You just take your time.

THE WITNESS: They were asked about waiving their rights by Agent Sandler.

THE COURT: I want you to tell me what you recall.

THE WITNESS: What I recall is that Mr. Restrepo said that he would answer questions and that Ms. Tahany said she didn't know what this was about.

THE COURT: Anything else that you can possibly recall? Take your time.

THE WITNESS: That is as far as I can recall, your Honor.

THE COURT: You are certain you have exhausted your memory?

THE WITNESS: That is as much as I can recall at this point, your Honor.

THE COURT: Any other questions, Mr. Levander?

MR. LEVANDER: Not on this topic, your Honor.

THE COURT: Any further questions, Mr. Joy?

MR. JOY: No questions, your Honor.

THE COURT: Mr. Villoni?

MR. VILLONI: No questions, Judge.

Supp. Tr. 104–105.

In the first hearing, Special Agent Sandler testified that after he advised Restrepo of his rights:

I asked him would he like to waive his rights and talk to us at that time and cooperate with us, and he said yes, he would like to cooperate. He wanted to know what we wanted to know.

Tr. 196. Special Agent Sandler further testified that he then went over to Tahany, who was seated on a bed, and advised her of her rights.

I then asked her if she would like to waive her rights and talk to us, and she said yes.

Q Did you have any further conversation with Ms. Tahany at that time?

A No, I did not.

Tr. 200.

Special Agent Colon, who had custody of Tahany, testified:

Then the conversation between Ms. Tahany and Agt. Sandler took place. Then—

THE COURT: Where were you at the time of this conversation?

THE WITNESS: Standing next to the chair in which Ms. Tahany had been seated.

THE COURT: Now, what did you hear being said?

THE WITNESS: I heard Agt. Sandler give Ms. Tahany what I believe to be the *Miranda* warnings.

THE COURT: Well, you were standing right there. What did you hear said? What did he say?

. . . .

THE WITNESS: I recall Ms. Tahany in response to some of Agt. Sandler's statements say, "Yes, I understand," "Yes, I understand."

THE COURT: Do you recall anything else she may have said?

THE WITNESS: At that time, no.

THE COURT: Then what happened next?

THE WITNESS: Then Agt. Sandler turned to Mr. Restrepo and gave him his rights. Mr. Restrepo had responses of "Yes, I understand," and "Yes," and "Yes, I do."

Tr. 343–44, dated November 19, 1981. Special Agent Joura testified:

A. Well, as I entered the apartment and went past Mr. Restrepo and then went towards the bathroom, I heard Agt. Sandler advising—

. . . .

Q. Do you remember the substance of what was said at that time?

A. Yes. Agt. Sandler was advising someone—and since my back was to him I don't know who it was—of their rights.

Q. By "rights," do you remember what that was?

A. The *Miranda* warnings.

THE COURT: Did you hear any responses from this someone?

THE WITNESS: I wasn't particularly paying attention to that at that point.

Q. Did there come a time that you spoke to either Mr. Restrepo or Ms. Tahany?

A. Yes.

Q. When approximately was that in relation to these warnings that you recall but not the words of?

A. Shortly after I came back to the living room area I spoke to Mr. Restrepo.

Q. What if anything did you say to him and what if anything did he say to you?

A. I asked him to come with me. We went into the bathroom. I closed the door. He was handcuffed. I took the handcuffs off. I identified myself to him. I let him read my credentials. Then I advised him that he was under arrest for violation of federal narcotics laws, and I advised him that he had the right to remain silent and that anything he said could and would be used against him in court or other proceedings.

THE COURT: Was this in the bathroom?

THE WITNESS: That's right.

Q. Did he—

A. I asked him did he understand what I was saying, and he said yes. I told him he had the right to an attorney and to have that attorney present during any questioning and if he couldn't afford an attorney that a court would appoint one for him at no cost to him. I asked him if he understood that. He said yes.

I told him that if he agreed to be questioned that he could stop the questioning at any time for the purpose of consulting with an attorney. I asked him did he understand that. He said yes.

I asked him, "Do you have any problem understanding me? Do you understand English?" He said yes.

I told him I was interested in finding out where the packages had come from. I was more interested in the people who had sent the package to him than I was in him. I told him that he had the right to make me apply for a search warrant or he could consent to me searching the apartment. I asked him was it his apartment. He said yes, he held the lease.

I asked him if there were any weapons in the apartment. He said no.

I said, "Are there any drugs in the apartment?" He said, "There are some."

I told him again that I had every intention of applying for a search warrant and if I came back here and found anything that he had not already told me about, that it would look worse for him [3] and I would consider that he had not been cooperating. I explained to him that the best thing to do to help himself now would be cooperate fully, and if he did cooperate, at the time of any sentencing I would make the extent of his cooperation known to the judge.

Q. When he said there were some, talking about the drugs, did he specify what or where they were?

A. No, not at that point.

He told me that I could search his apartment. I said, "Okay, take me to where the drugs are."

At this point he asked, "Could I get dressed before I go back out into the apartment?" I said fine.

I had one of the other agents get me some clothes from the closet and while I stood in the bathroom he got dressed. Once he was dressed we went back out into the main part of the apartment.

---

[3] The government stipulated that Special Agent Joura told AUSA Martin that he said to Restrepo that "it would look worse for him and Ms. Tahany ...." Tr. 46.

Tr. 267–70.

Restrepo testified that when he heard Tahany say, "Adolfo open the door," he opened it. A group of people with drawn guns entered. One of them threw him against a wall, searched and handcuffed him. He said: "Please, don't destroy my apartment." Agent Sandler began to read him his rights. Restrepo further testified:

He was reading .... and my mind was so confused, and I don't understand whatever he says. And I point to Joyce Tahany my head—was near to me—and I say, "What he says?"

And she explain to me what he says. Tr. 391–393.

According to Restrepo at this time the agents were everywhere in the apartment:

Q. Could you tell me what they were doing?

A. Was an agent in front of me in the desk, open drawers, was in the night table of Joyce. There was another one in the night table near to the door, and was another one in the area of the bathroom and the closets. There was another one in the kitchen. It was about six.

Q. What were they doing in the kitchen and by the night table?

A. Looking everywhere, open everything.

. . . .

Q. Up to that point have they asked you permission to open the drawers as you have described?

A. They open already, they have opened everything.

. . . .

Q. Now, did there come a time when you removed from—when you left that particular area where you were standing?

A. After that when they took me to the bathroom.

Q. When you say "they" who precisely or specifically, if you know their names from their having testified, would it have been who took you to the bathroom?

. . . .

Q. Agt. Joura?

A. Yes.

Q. Did any other agent accompany him?

A. I doubt it.

Q. What happened in the bathroom?

A. He asked me if I want to cooperate, and I say yes. But I was nervous, I was very nervous. And first when I was in the living room and they are searching everything and I hear, you know, noises like that they going to break the whole apartment, I say, "Please don't break my apartment." So they say, "Can we search? Can we look around?" I say, "Yes, do it." But I was nervous.

Q. Was this in the living room?

A. Was in the living room, but they are doing already, so I say, "Yes, do it, but don't destroy anything."

. . . .

Q. What happened in the bathroom? Did you have a conversation with Agt. Joura?

A. Yes.

Q. Could you tell the court what he said to you and what you said to him?

A. He says, "Do you know you may keep silent, but I would like if you want to cooperate." And I say, "I want to cooperate."

Q. Did he give you your rights again, similar to the rights that were given to you before when you were in the kitchen area?

A. No, only once.

Q. Only once?

A. Yes.

THE COURT: What did he say?

THE WITNESS: In the kitchen area?

THE COURT: No, in the bathroom area. What did Agt. Joura say to you?

THE WITNESS: Explain to him what was going on.

THE COURT: No, you must tell me so I will be able to understand what happened. What did he say to you? What did you say to him in the bathroom?

THE WITNESS: He ask me what is in the package.

Q. Was that the first thing he said?

THE COURT: Was that the first thing he said to you when you got to the bathroom?

THE WITNESS: I think so.

THE COURT: Did you answer him?

THE WITNESS: Yes.

THE COURT: What did you say?

THE WITNESS: I say I don't know.

THE COURT: Go ahead. Tell me the conversation.

THE WITNESS: So he says—so I say I don't know who send this. He say, "What do you mean, you don't know?"

I say, "This package was not for me." And he says, "For who?" And I say, "For Fernando Fernandez."

He ask me his phone number. I say I don't have it. He says, "Why?" And I say, "He doesn't want to give it to me."

He says for his address, and I say I don't know.

So he says, "You don't want to cooperate."

I say, "I do."

So he says, "Let's go."

So he took my—he took the handcuffs—he open it and he reach me a shirt and jeans. I get dressed and we get out of the bathroom.

Q. Did you have your handcuffs still on during this time?

A. After I get dressed, he put back.

Tr. 393-99.

## CONCLUSIONS OF FACT AND LAW

### I.

*Restrepo's Claim to Suppress FEC Packages*

Restrepo sought suppression of the FEC packages, alleging that FEC had a policy of

opening suspect mail and turning over illicit contents to the government. He argued that the FEC was an agent of the government, such that seizure of evidence in the absence of a warrant violated his Fourth Amendment right of privacy.

██ The Court ruled from the bench[3] that, because of the permission given by the sender Andre to FEC to open the packages,[4] Restrepo did not have an exclusive right of privacy in and to the contents and therefore did not have a valid Fourth Amendment claim. Since FEC discovered the contraband in a lawful manner,[5] the government agents were entitled to receive the contraband and conduct an investigation as to its source and destination. The packages were in open view when seized in the apartment and are admissible upon trial. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978).

## II.

*Tahany's Fourth Amendment Claim*

Tahany argues that no probable cause for her arrest was alleged in the complaint filed by Agent Reape, therefore, the arrest warrant issued for her was void and her arrest in the hallway was unlawful. Any statements made by her or evidence seized she argues, are fruits of the illegal arrest and should be inadmissible, she argues, citing *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

██ Even assuming, without deciding, that there was no probable cause for issuance of the complaint or arrest warrant

naming Tahany, the more appropriate query is, absent an arrest warrant, did the government have probable cause to arrest Tahany at the time she was taken into custody in the hallway on April 3, 1982?[6] The government argues that when Special Agent Reape delivered the packages, he saw and heard Tahany on the phone saying, "they're here now." This fact, coupled with Tahany's prior calls to FEC inquiring about the packages, furnished probable cause for her arrest.

Tahany counters that Agent Reape may not take advantage of the overheard phone conversation because he used a ruse[7] in order to be in a position to gain that information. This argument must be rejected. In *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), a person, who the Court assumed for purposes of the argument was a government informant, visited Hoffa in his hotel room while Hoffa was on trial. The informant reported conversations which took place in the hotel room. As a result, another indictment was filed against Hoffa for jury tampering. In rejecting Hoffa's Fourth Amendment claim, the Court stated:

> Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrong doing will not reveal it.

*Id.* at 302, 87 S.Ct. at 413. The Court explained that the informer was in the hotel suite by invitation, not by force or stealth. Every conversation he reported

---

**3.** Tr. 51–52.

**4.** The contract whereby a sender gives permission to FEC to open packages was introduced as government's Exhibit 3. *See* Tr. 49–50.

**5.** The Supreme Court held in *United States v. Maltock,* 415 U.S. 164, 170, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1973):

> [T]he consent of one who possesses common authority over ... effects is valid as against the absent, nonconsenting person with whom that authority is shared.

This Circuit held in *United States v. Buettner-Janusch,* 646 F.2d 759, 765 (2d Cir. 1981):

> The well established rule in this Circuit is that "[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." [citations omitted]

**6.** *See United States v. Watson,* 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976) ("The necessary inquiry, therefore, is not whether there was a warrant ... but whether there was probable cause for the arrest.").

**7.** The alleged ruse was that Agent Reape pretended to be an FEC deliveryman.

was either directed to him or knowingly carried on in his presence. The Court held that Hoffa's claim did not result from an invasion of the privacy of his hotel room but from his misplaced confidence in the informer.

■ When Restrepo answered the door, expecting delivery of the FEC packages, he had no expectation of privacy in the transaction of accepting those packages. He would have opened the door to his home to anyone he believed was an FEC messenger. Once the door was open, Special Agent Reape overheard Tahany's conversation on the telephone. Tahany's misplaced belief that the messenger was a FEC employee does not support a finding of impermissible conduct by the agent. This Circuit stated in *United States v. Taborda,* 635 F.2d 131, 139 (2d Cir. 1980):

> We conclude that observation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy.

Since Special Agent Reape's presence at the door of the apartment did not violate Tahany's Fourth Amendment right to privacy, the agents were entitled to consider Tahany's telephone conversation, in addition to her calls to the FEC office and her presence in the apartment where the controlled delivery of the contraband was made, in determining whether or not there was probable cause to arrest her. The Court rules that these factors considered together constituted probable cause for Tahany's arrest in the hallway outside the apartment. Her arrest was therefore lawful.

## III.

*Restrepo's Fourth Amendment Claim to Suppress Other Evidence*

■ Defendant Restrepo moves this Court to suppress physical evidence taken from his apartment alleging a violation of his Fourth Amendment right to privacy on the grounds that the search was conducted without a warrant and he did not voluntarily consent to the search. The government alleges voluntary consent was given.[8]

In terms of this case, the question is not whether Restrepo gave the agents permission to search his apartment but, rather, whether that permission was given under circumstances which prevented him from making a free and rational choice? In examining the circumstances as they existed at the Restrepo premises, our concern is not with the legality of any individual act or acts[9] but rather with the effect of the total activities upon the defendant's capacity to give a rational consent.

The record on the hearing[10] reveals that, in order to gain entry, Special Agent Joura told Tahany that if she did not persuade Restrepo to open the apartment door he would take it down. When Restrepo opened the door six or seven agents entered with guns drawn.[11] Then, defendants were handcuffed.

Special Agent Sandler reported that Restrepo waived his *Miranda* rights and consented to the search. Special Agent Reape, hearing the same conversation, testified that neither Restrepo nor Tahany had waived their rights. About a minute after entry into the apartment, Special Agent Joura, having completed the protective search, then approached Restrepo. Without

---

**8.** The government bears the burden of proving consent. As the Supreme Court stated in *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968):

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely ... given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.

**9.** *See United States v. Marotta,* 326 F.Supp. 377 (S.D.N.Y.1971), *aff'd,* 456 F.2d 1336 (2d Cir. 1972); *United States v. Gross,* 137 F.Supp. 244 (S.D.N.Y.1956).

**10.** Testimony relevant to the Fourth and Fifth Amendment claims of the defendants is reproduced *supra,* pages 7–20.

**11.** Tr. 105, 106, 392, 416.

asking or being told by Special Agent Sandler that Restrepo had waived his *Miranda* rights and had consented to a search, Special Agent Joura took Restrepo, who was still handcuffed and in pajamas, into the bathroom and closed the door. Special Agent Joura testified that, after hearing his rights, Restrepo agreed to cooperate and consented to the search. Restrepo testified that the search began before he was taken to the bathroom, and that after he heard "noises like that they going [sic] to break the whole apartment,"[12] he then consented to the search.

This Court finds upon the totality of the circumstances that Restrepo did not voluntarily consent to the search of his apartment for the following reasons:

1. Prior to making the controlled delivery of the FEC packages Agent Reape contacted AUSA Martin, who not only approved the controlled delivery but filed the complaint and secured an arrest warrant.

2. AUSA Martin, who was in his office at the time of the arrest, was prepared to secure a search warrant for the premises.[13]

3. The apartment door was unlocked after Special Agent Joura told Tahany that if the door was not voluntarily opened he would take it down.

4. Six or seven agents entered a one-room studio apartment with guns drawn.

5. According to Special Agent Reape's original testimony, Restrepo did not waive his rights or consent to the search.[14]

6. If Special Agent Sandler is to be credited, Restrepo consented to the search. However, if Sandler *did* secure Restrepo's consent, there was no reason for Special Agent Joura to take a pajama-clad, handcuffed prisoner into a closed bathroom, to warn him again of his rights and to secure his consent for a second time.

7. Restrepo is an alien who had never been arrested before[15] and who, as the Court observed at the hearing, was not fluent in the English language.

8. Restrepo testified that he consented to the search, after it began, because he was afraid the agents would "break" his apartment.

For all of the above reasons, this Court finds that the government has not sustained its burden of proof by either clear and convincing credible evidence or by a preponderance of the credible evidence that Restrepo's consent was voluntary.[16] The Court finds that the consent given, in light of the totality of the circumstances, was the product of Restrepo's submitting to what he reasonably believed was the exercise of lawful authority. *United States v. Sanchez*, 635 F.2d 47, 61 (2d Cir. 1980). The Court further finds that the alleged consent was not the result of a free and rational choice by Restrepo. All the physical items taken from the apartment, except the FEC boxes

12. Tr. 396.

13. Tr. 520. AUSA Martin testified that he told Special Agent Reape he would stay in his office and wait for a phone call if the agents needed a search warrant. He was called from the Restrepo apartment and one of the agents said consent to search had been given.

14. This Court finds that the testimony of Agent Reape on April 15, 1982 was a patent effort to recant the testimony he gave at the previous hearing. A close reading of his final responses and observance of Reape during the hearings leads the Court to believe that when Agent Reape finally recognized his tailored testimony would not be accepted without question, he reverted to the essence of his testimony at the prior hearing.

15. Tr. 491.

16. In *U.S. v. Mapp*, 476 F.2d 67, 77 (2d Cir. 1973) Judge Kaufman stated:

[T]he overarching principles which govern the law of consent are clear. Consent to a search, and the waiver of Fourth Amendment rights which it implies, must be freely and voluntarily given, [citations omitted]. The government bears the burden of proving waiver, a burden which is discharged only upon a showing of clear and convincing evidence, [citations omitted]. Waiver of a constitutionally protected interest and "acquiescence in the loss of fundamental rights" cannot be presumed, [citations omitted], nor may it lightly be inferred....

and their contents, are therefore suppressed.[17]

## IV.

### The Fifth Amendment Claims

Defendant Restrepo moves to suppress all statements made by him to DEA agents at the time of his arrest and statements subsequently made to AUSA Martin on the ground that he did not waive his *Miranda* rights. Defendant Tahany moves to suppress, for violation of her *Miranda* rights, all statements allegedly made to agents in the DEA office subsequent to her arrest. The government contends that both defendants were properly advised of their *Miranda* rights and waived them.

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) Mr. Justice Stewart discussed two aspects of the Fifth Amendment claims raised herein, *i.e.* the standards of voluntariness and of waiver. After citing the voluntariness test of *Culombe v. California,*[18] 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) the Court stated that, to determine whether the statement was voluntary, judges must look to the totality of circumstances surrounding the confession and their psychological impact on the accused, and evaluate how the accused reacted. The *Schneckloth* Court further stated that the standards of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)[19] are a necessary prerequisite to a finding of valid waiver.

### A. Statements at Time of Arrest

 A review of the credible evidence in the record does not support a finding that these defendants voluntarily or knowingly and intelligently waived their *Miranda* rights at the time of their arrest. The same operative facts that this Court found insufficient to sustain the government's burden of proof that Restrepo's consent to a search of his apartment was voluntary preclude a finding that the statements he made in the apartment were the result of a free and unconstrained choice. Similarly, those facts do not support a finding that Restrepo's alleged waiver of his *Miranda* rights was a relinquishment or abandonment of a known right or privilege.

The evidence as to Tahany's alleged waiver is even less convincing. Special Agent Reape, before he discredited himself, testified that after Tahany said she would not waive her *Miranda* rights, she was asked if she would answer any questions. Her response was that she didn't know what it was all about. Special Agent Sandler testified that after the *Miranda* warnings:

> I then asked her if she would like to waive her rights and talk to us, and she said yes.
>
> Q Did you have any further conversation with Ms. Tahany at that time?
>
> A No, I did not.[20]

 Special Agent Colon, who had Tahany in custody at the time Special Agent

---

**17.** The FEC boxes and contents were in plain view and therefore subject to seizure. The other items taken from the apartment were not on the person or within the immediate control of Restrepo. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) the Court recognized the continuing validity of *Chimel* by citing it for the proposition that a search warrant authorizes search of a broader area than an arrest warrant.

**18.** In *Culombe,* the Court held:

The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: The test of voluntariness. Is the the confession the product of an essentially free and unconstrained choice by its maker? If it is, if

he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

367 U.S. at 602, 81 S.Ct. at 1879.

**19.** Those standards were explained as follows:

A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver ... must depend, in each case, upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.

304 U.S. at 464, 58 S.Ct. at 1023.

**20.** Tr. 200

Sandler advised her of the *Miranda* rights, testified that the only response Tahany made was: "Yes, I understand," "Yes, I understand." When asked if she recalled Tahany saying anything else, Special Agent Colon responded: "At that time no." [21]

There was no other evidence offered at the hearing as to Tahany's alleged waiver. However this Court finds a most relevant piece of evidence in the pleadings. Counsel for Tahany moved to suppress statements made by his client to AUSA Martin. Attached to his affidavit in support of this motion is a photocopy of the form used by AUSA Martin during his interview of Tahany.[22] This form discloses that, after each of the *Miranda* warnings, the AUSA wrote either "Nods yes", "Yes" or "ok". However, after the question: "Understanding your rights, are you prepared to answer questions without an attorney?" the form is blank. At the hearing, the government stipulated that it would not use any statements made by Tahany to AUSA Martin on its case in chief.[23]

To summarize, this Court finds upon the credible evidence, that the government has not sustained its burden of proof that defendants Tahany and Restrepo voluntarily, knowingly and intelligently waived their Fifth Amendment rights while in the apartment at the time of arrest. Therefore, all statements made by them from the time the agents entered the apartment until the time they were taken out of the apartment are suppressed.

**B.** *Post Arrest Statements*

*Tahany*

Special Agent Reape testified that Tahany and Restrepo were taken from the apartment to the DEA office where, without any further advice of rights, Tahany and he had a conversation.

> I told Ms. Tahany that it was a serious offense that she was arrested for, and she told me that she did not know anything about what the arrest was all about.[24]

He then asked her about the events leading up to her arrest. She made certain admissions [25] which she seeks to suppress as violative of her Fifth Amendment rights. That motion is granted because the record is devoid of any testimony that Tahany was advised by any agent of her *Miranda* rights after she was taken from the apartment and prior to questioning at the DEA office.

---

**21.** Tr. 344. In *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), Chief Justice Warren said:

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

**22.** *See* Government's Exhibit 16h.

**23.** At the reopened hearing, AUSA Martin testified:

> Q. Why is it left blank if your practice is to write down either "no, I don't want an attorney. I want to waive my rights" or "yes, I do." Why is this blank?
> A. I asked these last two questions, in essence, together.
> Q. The two questions, for the record, the first one from the last is "You may pick and choose those questions you wish to answer and you may stop at any time. Do you understand that?" And what's written here is "Okay."

> The last one, "Understanding your rights, are you prepared to answer questions without an attorney?" That is blank.
> Now, when you say you asked those two questions together, what do you mean?
> A. I believe I asked the second one first. In other words "Understanding your rights, are you prepared to answer questions without an attorney? You may pick and choose the questions you wish to answer and you may stop at any time." I know that I advised her of both of those facts and she never expressed a desire to have an attorney. If she had, I would have stopped the interview. I would have written it down and I would have not asked any more questions.
> I have never, when anybody asked me for an attorney, gone on to question them because it is my understanding and my belief of the law that when an individual requests an attorney, that's the end.
> Supp. Tr. 669–70.

**24.** Tr. 129.

**25.** Tr. 129–30.

*Restrepo*

After leaving the DEA office, the defendants were taken to the office of AUSA Martin. There, Restrepo made certain statements which are the subject of his motion to suppress. Defendant alleges that he requested an attorney. AUSA Martin denies that any such request was made.

AUSA Martin testified during the suppression hearing that one of the purposes of an interview is to get pedigree information for bail purposes. A second purpose is "to develop information that may be useful in the prosecution of the case." [26] A third reason offered for the interview is to get the defendant to cooperate. AUSA Martin further testified that in this case he had filed the complaint and secured the arrest warrant for Restrepo earlier during the day in question, and that he knew at the time of the interview that the Magistrate was waiting for Restrepo to be produced for arraignment.

The Court called Magistrate Raby to testify as to the procedure in the Magistrate's office after arrest up to arraignment. The Court had the following colloquy with the Magistrate:

BY THE COURT:

Q. Does the Magistrates' office—you told me the answer was correct of Mr. Martin. Does the Magistrate's office then request the U.S. Attorney's office or the Assistant United States Attorney to interview defendants as far as their need for counsel?

A. You can assume, your Honor, that the clerk of the Magistrate has a standing arrangement with the United States Attorney's Office that the Magistrate's office is to be informed as soon as possible as to the need; the potential need of a defendant for counsel so that arrangements can be made to secure counsel for that defendant at the arraignment.

Q. Is there an alternative way that the Magistrate could be informed of the need for counsel other than through the Assistant United States Attorney?

A. Well, theoretically it is possible he could be informed of that need in the course of the interview with the Pretrial Services Agency but the difficulty there is since that interview takes place immediately prior to the arraignment the Magistrate's Office might not be aware of the necessity perhaps of getting additional attorneys in court for the arraignment.

Q. Tell me, why is it that the Pretrial Service Agency interview is at the end of the arrest process rather than at the beginning of it?

A. Well, that is the way the United States Attorney's Office has preferred to conduct matters. The United States Attorney's Office, to my understanding, prefers to conduct the initial interview of the defendant following which he is turned over to the Pretrial Services Agency.

Q. Is there any statute or rule of the court that proscribes the order in which a defendant is to be, one, fingerprinted, two, processed, three, interviewed? How does this come about that Pretrial Services is at the end of the arrest process?

A. In answer to your first question, your Honor, there is no rule or statute which controls the order of those three steps. Basically the reasons it is done that way is because the defendant is in the custody of the United States law enforcement system and the United States Attorney and the United States Attorney has in the course of his years of practice with criminal defendants determined that this is the most appropriate way of handling these matters.

The United States Magistrate has never been consulted about the order in which they take place and the United States Attorney has never been consulted as to the question of the propriety of conducting, for example, a pre-arraignment interview with the defendant. The United States Attorney takes the position that it is his prerogative to conduct such interviews. I know of no rule or statute which would prevent the United States

26. Tr. 497.

Attorney from conducting a pre-arraignment interview.

Q. Does the Magistrate or do you have an opinion as to whether the United States Magistrates believe that this is the best process or a proper process?

A. Well, as a Magistrate I have a serious concern about the propriety of pre-arraignment interviews if for no other reason than that it tends to place at a disadvantage the more impecunious type of defendant. Where we are dealing with a well heeled defendant who can afford private counsel his private counsel will put a stop to any interview questions by the United States Attorneys in most instances. The exception would be where the attorney determines that cooperation is the order of the day.

But since a private attorney would have a tendency to tell his client not to subject himself to an interview, and since a person who does not have a private attorney does not get an opportunity to be interviewed by a Legal Aid Attorney until the time of his arraignment, which is after the interview and in many instances after incriminating statements have been made, I have the distinct feeling that the type of procedure employed by the United States Attorney's office acts to discriminate in favor of a wealthier defendant. That is my own private view. I must say it is shared by many of my colleagues.

Q. What concerns me, Magistrate Raby, is that Mr. Martin testified that one of the purposes of the interview was to elicit incriminating statements from the person under arrest.

A. That is undoubtedly the prime purpose of such interview and, of course, if the United States Attorney advises a person of his rights and the person being interviewed is fully cognizant of his rights and nevertheless offers to make incriminating statements he has been adequately warned. The trouble, of course, is that a great many of these defendants in the course of the trauma of their arrest and a pre-arraignment interview are not fully capable of defending themselves against the questioning of the United States Attorney and they do not have the benefit of the advice of their prospective CJA counsel or Legal Aid counsel and, as a matter of fact, it was suggested at one time by one of our Magistrates to the United States Attorney that the appointment of counsel should take place automatically before the interview and that suggestion was rejected by the United States Attorney.

The feeling of that particular Magistrate was that if the prospective interviewee was advised or had the benefit of having a determination made as to his eligibility for appointment of counsel before the interview and then have that counsel present at the interview, in most instances the defendant would be advised by the Legal Aid or CJA counsel not to talk.

Perhaps that is the reason why the United States Attorney took such a dim view of the suggestion.

Q. Let me ask you: In the Supreme Court when it was talking about the rights of a person on arraignment, wasn't the thrust of its cases that the defendant should be advised by a judicial officer, in our case a Magistrate, of his rights rather than by someone else?

In other words, what I am trying to do is understand how this practice developed in this district. I understand from other sources, and perhaps you know that this is the only district in the country that has this practice.

A. It is a long-standing practice, your Honor, one that existed when I was an Assistant United States Attorney back in 1941 and it has existed probably long before that and has continued to exist through the years. It has been defended by the United States Attorney, among other things, on the ground that it is one way of determining whether a person brought before the United States Attorney should in fact be prosecuted or whether prosecution should be declined.

Q. Well, in this case a complaint had already been filed so that could not be an

issue. Although technically perhaps, since the arraignment is the beginning of the criminal proceeding under the law in this district, but still a complaint had been filed and the process had shifted from investigatory to accusatory.

A. I think it would undoubtedly be more consistent with the intent and purpose of the Miranda case that a person about to be arraigned before a judicial officer should be advised of his rights by a judicial officer before he is interviewed by the United States Attorney's office.

But, as I said before, there is no rule, that I am aware of, which would require that procedure.

Supp. Tr. 13–18.

This Court is seriously troubled by this record, and believes from listening to Restrepo's testimony at the hearing that (1) his need for an interpreter to understand many of the questions,[27] (2) his lack of fluency in the English language, and (3) the fact that he had no prior experience with the law, render it extremely unlikely that he was able to fully comprehend the rights as read to him from the AUSA interrogation form. AUSA Martin testified that he made no effort to explain these rights, other than to read them as they were written.

The Court re-opened the hearing to receive further testimony from AUSA Martin about his advice to the defendant concerning the delay in arraignment in a situation where a defendant waits for a private attorney. AUSA Martin testified on the initial hearing:

THE WITNESS: I said that he would have to have an attorney at arraignment.
THE COURT: How did you convey that to him? I think you told us something earlier on. What's on your paper concerning it?

THE WITNESS: The two things relating to that that are on the paper are that he has the right to consult an attorney and to have that attorney present during this interview. I asked him if he understood that. He said "okay."

Secondly, I said "if you don't have the funds to retain an attorney, an attorney will be appointed to represent you and you don't have to answer any questions before that attorney is appointed, and you can consult with him." I asked him if he understood that.

In addition, I told him that even if he was—he had a private attorney, somebody that he was waiting for, that he had the right to have an attorney appointed to represent him if there was going to be a delay in his attorney arriving.
THE COURT: Did you ask him if he had a private attorney?
THE WITNESS: I just read him those rights and he understood them. I did not ask him that.
THE COURT: You did not ask him if he had a private attorney?
THE WITNESS: No, your Honor.
THE COURT: Did you ask him if he wished the court to appoint an attorney for him?
THE WITNESS: I just asked—I asked if he understood what I said. That's all that I asked.
THE COURT: I am asking you a different question. Did you at any time ask Mr. Restrepo if he wished to have an attorney appointed?
THE WITNESS: No, I didn't.[28]

At the re-opened hearing, AUSA Martin testified that he made no notes nor was their any other record made of his advice to the defendant concerning the delay that would be incurred in waiting for a private attorney.[29]

27. The Court in *United States v. Ortega,* 471 F.2d 1350, 1362 (2d Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973) specifically mentioned that the foreign born defendant in that case was questioned "with the assistance of a French interpreter."

29. Supp. Tr. 653. This Court notes that in such an unequal contest the minimal safeguard would have been to preserve the interview either by tape recording or video tape for later review by the hearing court. It is routine procedure in the District Attorney's offices of New York State to video tape such interviews, so

This Court finds that at the time of Restrepo's interview with AUSA Martin, the complaint had already been filed and the criminal process had shifted from investigatory to accusatory. After hearing defendant testify, the Court finds he is neither fluent in English nor familiar with the criminal process. He was interviewed, however, without the aid of an interpreter. The Court further finds that one of the primary purposes of the interview was to obtain incriminating statements which could be used against the defendant on trial.[30]

 This Court agrees with the concerns of the Magistrates [31] as expressed by Magistrate Raby. The government chose to interview this defendant prior to arraignment. It had the ability to preserve the entire interview but did not do so. Therefore the Court is confronted with the dilemma of deciding between two plausible, inconsistent versions: that of Restrepo, who maintains that he wanted to have an attorney present at the interview, or that of AUSA Martin, who testified to the contrary. On the entire record, this Court finds that the government has not sustained its burden of proof that defendant Restrepo waived his right to an attorney at the AUSA interview. All statements made to AUSA Martin by Restrepo therefore are suppressed.

## CONCLUSION

The motion to suppress items taken from Restrepo's apartment, except the FEC boxes and their contents, is granted as to both defendants. The motion to suppress all statements made by defendants from the time agents entered the Restrepo apartment until the time defendants were taken from the apartment is granted. The post-arrest statements of Tahany to DEA agents are suppressed. Finally, Restrepo's statements to AUSA Martin are suppressed.

It Is So Ordered.

## APPENDIX A

# *Memorandum*

TO : Magistrates Bernikow, Gershon, Jacobs Schreiber and Sinclair

DATE: June 14, 1978

FROM : Magistrate Raby

SUBJECT: Re: PRE–ARRAIGNMENT INTERVIEWS BY UNITED STATES ATTORNEY; POSSIBLE COURT RESTRICTIONS WITH RESPECT THERETO

A question has been raised as to whether Federal District Courts have power to issue a general rule or order compelling the United States Attorney to proceed with arraignments of arrested persons before United States Magistrates * without conducting a prior "interview" of the defendant, under pain of possible sanctions, including possible dismissal of the charge.

---

that on a subsequent motion, the court has an independent objective basis of determining the issues. *See* New York Law Journal, March 19, 1979, at 1.

**30.** *United States v. Middleton,* 344 F.2d 78 (2d Cir. 1965).

**31.** *See* Memorandum from Magistrate Raby to Magistrates Bernikow, Gershon, Jacobs, Schreiber and Sinclair dated June 14, 1978, attached hereto as Appendix A.

* Criminal Rule 5 specifically provides that an arrested person shall be taken "without unnecessary delay before the nearest Federal Magistrate".

Since, even prior to the enactment of the Speedy Trial Act, Federal District Courts had frequently exercised the power of dismissing complaints or indictments for non-diligent prosecution, in presumed compliance with the provisions of the Sixth Amendment of the Federal Constitution, one could argue, by analogy, that a Magistrate or Federal District Judge could dismiss a charge against a defendant who has not been promptly arraigned before a Magistrate in compliance with the provisions of Criminal Rule 5.

Despite such possible argument in support of such procedure, I know of no instance where a criminal complaint has been dismissed by a Magistrate or District Judge merely on the ground of undue delay in arraignment. Apparently, the sole sanction which the Courts have thus far seen fit to impose upon the Department of Justice for unduly delayed arraignments is to suppress evidence obtained from the defendant during his detention prior to his arraignment. This sanction is best exemplified by the cases of *McNabb v. United States,* 318 U.S. 332, 341 (1943) and *Mallory v. United States,* 354 U.S. 449 (1957)

A strong argument can be made that such sanction is quite adequate to protect a defendant against any unconscionable conduct by the United States Attorney in failing to comply with the provisions of Rule 5 respecting prompt arraignments.

Some of the Magistrates of the Southern District feel, however, that irrespective of whether there is any undue "delay" in arraigning the defendant, the mere fact that the defendant is interviewed by the United States Attorney before the defendant has an opportunity to have the Magistrate advise him of his rights and to consider his application for appointment of CJA counsel is a violation of the spirit of the *Miranda* rule and a possible violation of the defendant's constitutional right to have counsel representing him at all stages of his prosecution. Those Magistrates contend, therefore, that there should be a Court rule prohibiting pre-arraignment interviews entirely.

Certainly, in view of the holding of the *Miranda* case that a defendant must be advised of his right to have counsel appointed for him and to have any questioning terminated until counsel is appointed in the event of a request for counsel, and further, in view of the fact that the United States Attorney's office for the Southern District of New York is apparently the only federal prosecutor's office in this country which still adheres to the practice of conducting prearraignment interviews, there is certainly a colorable basis for suggesting the desirability of the issuance of a general rule by the Court—assuming that it has power to issue such a rule—affirmatively requiring that *all* defendants arrested by federal agents be brought directly to the United States Marshal before arraignment by a Magistrate rather than to the United States Attorney's office, which I understand to be the general practice.

The United States Attorney argues vigorously in support of its right to conduct a pre-arraignment interview, contending that inasmuch as each defendant is fully advised of his *Miranda* rights and has the right to remain silent if he chooses, there is no violation of the defendant's rights incident to an attempted pre-arraignment interview and that there are valid policy reasons, in terms of effective prosecution, for continuing to permit such interviews.*

In response to that argument, some of the Magistrates urge that as a result of the continued practice of the United States Attorney in conducting pre-arraignment interviews, a disparity now exists between indigent defendants who have no one to advise them prior to arraignment of their rights, and defendants of means, whose lawyers— usually retained before the arraignment— almost invariably advise their clients not to answer any questions put to them by the United States Attorney, at least until they are permitted to attend the pre-arraignment interview. Assuming, then, for pur-

* See United States Attorney's letter to Chief Judge Kaufman of the Court of Appeals dated April 10, 1978, a copy of which was made available to me by Magistrate Gershon.

poses of this discussion, that the wrong to be remedied is not the practice of the pre-arraignment interview *per se,* but rather the alleged practice of the United States Attorney in refusing to expressly advise the defendant of his right to apply to the Magistrates' office for appointment of counsel, prior to being questioned, in the event of indigency, there are, of course, two possible ways of dealing with this assumed discrepancy. The first method would be the promulgation of a Court rule or general order prohibiting pre-arraignment interviews entirely. The second method, obviously more moderate in scope, would be to issue an order merely requiring the United States Attorney to advise any defendant being interviewed of his right to apply to the Court for appointment of counsel based on financial need, if he wishes, before the interview proceeds.*

Since the first of these two alternative proposals on its face might be construed as an unwarranted intrusion by the Courts upon the prosecutorial functions of the United States Attorney's office, particularly in cases where the defendant had no objections to a pre-arraignment interview, most of the Magistrates who question the present procedures in the United States Attorney's office would be satisfied, I believe, were the Court to adopt a rule or order encompassing the second alternative procedure, namely, an order requiring the United States Attorney to advise any defendant being interviewed of his right to apply to the Court for appointment of counsel in case of financial need, if he so wished, before the interview proceeded.**

Of course, no such rule or order would need consideration were the United States Attorney to assure this Court that it is the present practice of his office so to advise any defendant being interviewed of his right to apply to the Court for appointment of counsel, in case of financial need, prior to commencement of an interview as to the merits of the case. Thus, I think, the threshold inquiry should be to ascertain authoritatively what the actual practice of the United States Attorney is in the foregoing respect.

I would guess, based upon my prior dealings with the United States Attorney's office, that Assistant United States Attorneys always advise respective defendants of their right of counsel and their right to have counsel appointed for them, but do not tell them that they have the right to have counsel appointed for them prior to being questioned about the merits of the case. I believe that it is unlikely that the Assistant United States Attorneys advise defendants of this right, since, if defendants were so advised, I believe the overwhelming majority of them would proceed forthwith to the Magistrates' office to have counsel appointed for them before the interview continued, as indicated in the first footnote at page 3 hereof.

* As a practical matter, any such order or rule would yield the same result as the first alternative herein discussed, since the assumption is that the overwhelming majority of persons who are unambiguously advised of their right to seek appointment of counsel to represent them before answering any questions would exercise that right; and I don't think that that has *ever* happened while I was sitting as a Magistrate in this Court.

** One possibly valid objection to the promulgation of such a rule or order would be that the rule, by implication, would appear to condone the practice of the United States Attorney in conducting pre-arraignment interviews. While the Second Circuit Court of Appeals has indicated a willingness to tolerate the brief questioning of a defendant, prior to arraignment, by an Assistant United States Attorney for the purpose of verifying and reducing to writing prior oral admissions (see *United States v. Ladson,* 294 F.2d 535, 2d Cir. 1961, cert. den. 369 U.S. 824), the same Court has in no uncertain terms indicated that any period of delay in arraigning an accused becomes unreasonable if used to carry out a process of inquiry that lends itself to eliciting damaging statements to support arrest and ultimately defendant's guilt and that a delay must not be of a nature to give opportunity for extraction of a confession. *United States v. Middleton,* 344 F.2d 78, 2d Cir. 1965. I would accordingly suspect that the Judges of the District Court would be somewhat reluctant to issue a rule which in effect gave a "blank check" approval of pre-arraignment interviews by the United States Attorney.

If my assumption in the foregoing paragraph is correct, it seems crystal clear to me that the United States Attorney is violating the rights of indigent defendants by failing to afford them an opportunity to consult with Court-appointed counsel before they are questioned by the United States Attorney. What good does it do, for example, for the United States Attorney to advise a defendant being interviewed of the fact that he has the right to counsel and the right to have counsel appointed for him, if he is not also told that he has the concomitant right, if he wishes, to file an application with the Magistrate for appointment of counsel who will advise him as to the wisdom of answering questions put to him by the United States Attorney?

As matters now stand, the United States Attorney usually gives advance notice to the Federal Defenders Unit of a pending arraignment of an indigent defendant, but at the same time will not honor a request by the Federal Defenders Unit to cease the questioning of the prospective defendant simply because the United States Attorney takes the position—technically correct—that the Federal Defenders Unit representative has not yet been appointed as counsel. However, by the time the appointment is made, presumably the defendant has already made damaging admissions without having received the benefit of any legal advice.

Inasmuch as I remain convinced that any purported rule by the Court respecting the internal activities of the United States Attorney might be subject to question as an unwarranted judicial intrusion upon the prosecutorial functions of the United States Attorney's office, it seems to me that a more effective way of dealing with this problem would be to persuade the United States Attorney, if possible, that it is his duty under *Miranda* to make it clear to every indigent defendant that he has the right of appointment of counsel and the right to confer with counsel before proceeding with the pre-arraignment interview. It could be pointed out to the United States Attorney that his failure to advise the defendant of this right may well be the basis

for ultimate suppression of any admissions or confessions obtained during the pre-arraignment interview—not necessarily upon constitutional grounds, but rather based upon the inherent power of federal courts to formulate rules of evidence to be applied in federal criminal prosecutions as pointed out in *McNabb v. United States, supra,* at page 341.

## CONCLUSION

It is my considered view that if it is in fact the present practice of the United States Attorney to refrain from advising indigent defendants of their right to have counsel appointed for them under the Criminal Justice Act, and to consult with such appointed counsel prior to answering any questions as to the merits of their case, such practice is a highly questionable one and one which indeed ought to be remedied, hopefully not by any judicial intervention in the form of a rule or order expressly requiring that such advice be given, but rather by voluntary action on the part of the United States Attorney.

While, in the event of the failure of the United States Attorney to agree to take such voluntary corrective action, consideration could then be given to the possible alternative of promulgation of a Court rule or order either abolishing all pre-arraignment interviews or at least compelling the United States Attorney to give the type of advice hereinabove outlined, under pain of dismissal of the complaint, I believe that any such rule would be of doubtful legality. On the other hand, I would suppose that at some stage of some criminal proceeding in the near future a Legal Aid lawyer may well be successful in suppressing evidence obtained from an indigent defendant who was not properly enabled to consult counsel before he "spilled the beans", so to speak. Because of this very possibility, I would hopefully assume that the United States Attorney would be willing to give serious consideration to a voluntary revision of his internal procedures to the extent of making sure that all indigent defendants who indi-

cate a desire to do so will be permitted to apply to the United States Magistrate for appointment of counsel prior to the pre-arraignment interview by the United States Attorney.

 (s) Harold J. Raby
 HAROLD J. RABY
 UNITED STATES MAGISTRATE

HJR:EKD